FILED
03 MAY 20 PM 1:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| CURTIS D. MILLER ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 02-PT-1941-E |
| ) | |
| CITY OF ANNISTON, ALABAMA, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

ENTERED
MAY 20 2003

## MEMORANDUM OPINION

This cause comes on to be heard upon defendants' Second Motion for Summary Judgment (Doc. 26), filed on March 5, 2003.

### FACTS AND PROCEDURAL HISTORY

In the early evening of May 10, 2000, plaintiff Curtis Miller ("Miller"), an African American male, drove to the Winn Dixie grocery store located at the corner of Highway 202 and Gurnee Avenue in Anniston, Alabama, in his brown 1985 Buick Somerset. *See* Def. Ex. A at 31. While exiting the parking lot, Miller allegedly almost caused a collision with Officer Allen George ("George"), a Caucasian male, who was off-duty and driving down Gurnee Avenue in his personal vehicle. *See* Def. Ex. B at 1. George followed Miller and "observed the vehicle weaving back and forth . . . driving erratically and crossing over the center line." *Id.* George suspected that the driver was intoxicated, and called police dispatch on his hand-held radio. *Id.* According to defendants, no discussion was made over the radio concerning Miller's race. *See* Def. Ex. D at 2.

Defendant Officer Scott Garrison ("Garrison"), a Caucasian male, and Officer Michael

41

Evans ("Evans"), an African American male, were on patrol in the area and responded to the dispatch in separate vehicles. *See* Def. Ex. C at 16; Ex D at 1. By using hand signals, George indicated which vehicle he was following. *See* Def. Ex. B; Ex. C at 16. Garrison testified that he did not personally witness any suspicious driving, but that if another officer pointed the car out, "that was good enough for [him]." *See* Def. Ex. C at 35. Garrison turned on his lights and pulled Miller over. *See* Def. Ex. B; Ex. C at 16. Shortly thereafter, Evans arrived on the scene. *See* Def. Ex. D.[1] George did not stop and had no other part in the events in question. *See* Def. Ex. B.

Garrison and Evans walked up to the car window, made contact, and checked Miller for identification. *See* Def. Ex. C at 16-17; Ex. D. Again, Garrison states that until this point, he did not know Miller's race. *See* Def. Ex. J. Miller asserts that Garrison told him that the blinker on the car was not working. *See* Def. Ex. A at 33-34. Miller contends that all three went to the back of the car to see if the blinker was working. *Id.* Evans stated that maybe "the blinker might [have] come on late." *Id.* at 35. Miller notes that Garrison asked him to hand over his license, which he did. *See* Pl. Ex. 1. He also notes that he never received a ticket for any offense related to an improper turn signal, and contends that at all times his blinker was working. *Id.*

Garrison, Evans, and Miller all agree that Garrison asked Miller if he had been drinking, to which Miller replied that he had not. *See* Def. Ex. A at 34; Ex. C at 17-18; Ex D. They also agree that Garrison asked Miller whether he had any drugs, open containers, or weapons in the car, and whether Garrison could search the vehicle. *Id.* Miller replied that none of those items

---

[1] In his brief, Miller states that Garrison "was alone." *See* Pl. Br. at 2. However, it appears that Garrison was alone when he pulled Miller over, but that Evans was present for most of the subsequent events. *See* Pl. Ex. 10 at 33-35; Def Ex. D.

2

were in the vehicle, but that Garrison could search for himself if he wanted to. *Id.* Garrison later testified that it was his standard practice to ask to search a vehicle, because in his experience "intoxication is not just limited to alcohol." *See* Def. Ex. C at 41.

During the search, Garrison found a pill bottle under the floorboard of the driver's seat. *See* Def. Ex. A at 34, 36-37; Ex. C at 18-19; Ex. D.[2] Miller contends that he did not know that the pill bottle was there. *See* Pl. Ex. 1 at ¶ 10. All three witnesses agree that the pill bottle was a typical brown prescription bottle and that it had Miller's name on it. However, Miller contends that it also had a full prescription label on it, including a doctor's name, and that he told Garrison that he had been given a prescription for the medicine. *See* Def. Ex. A at 38; Pl. Ex. 1 at ¶ 10. By contrast, Garrison, Evans, and Assistant District Attorney Brian Howell ("Howell"), who later was assigned to prosecute the case, stated that there was no label, no doctor's name, and no pharmacy name. *See* Def. Ex. C at 18-20; Ex. D at 2; Ex. I at 1-2. However, the witness all agree that there were two different types of pills in the bottle. *See* Def. Ex. A at 62-63; Ex. C at 18-19; Ex. D. Garrison asserts that Miller denied ownership of the drugs until they arrived at the police station. *See* Def. Ex. C at 21-24, 44; Ex. J. Miller testified that he told Garrison that the pills were his and that they were prescribed by a Dr. Casey for a work-related injury. *See* Def. Ex. A at 25-28, 38-39.[3]

Garrison called the pharmacy at the Northeast Alabama Regional Medical Center from his patrol car and asked the pharmacist to identify the pills by the ID code printed on each pill.

---

[2] Garrison notes that the pill bottle has since been destroyed, allegedly because Miller failed to request that it be preserved. *See* Def. Ex. A at 58-59. He also notes that this lawsuit was filed over two years after the incident.

[3] According to Garrison, Miller testified that it had been at least five years since the pills were prescribed. *See* Def. Ex. A at 25-29.

*See* Def. Ex. A at 39-40; Ex. C at 19-21; Ex. D.  The first pill was identified as Cyclobenzaprine, a muscle relaxer, with the second being identified as Acetaminophen, which contains codeine. *See* Def. Ex. C at 19-21; Ex. D.[4]  Garrison allegedly asked Miller if he had a prescription for the pills, to which Miller responded that he did not. *See* Def. Ex. C at 21-22.  According to Garrison, because he had no way of checking to make sure that Miller had a prescription for the drugs, he arrested Miller for (1) possession of a controlled substance in violation of Alabama Code § 13A-12-212, and (2) illegal possession of prescription drug in violation of Alabama Code § 34-23-7. *See* Def. Ex. C at 23-24, 65-66.  Garrison placed Miller in handcuffs and transported him to the Anniston Police Department. *Id.* at 21.  Miller contends that Garrison told him to "put your hands on the trunk and stretch out," and proceeded to search him. *See* Pl. Ex. 1 at ¶ 11.  According to Garrison, he, Evans, and Miller all testified that there was no struggle by Miller and that no use of force was employed by Garrison. *See* Def. Ex. A at 36, 40, 43; Ex. D; Ex. J.  Miller contends that he was subjected to physical and emotional harm as a result of the conduct. *See* Pl. Ex. 1 at ¶ 12.  Garrison asserts that after taking Miller to the station, he had no further contact with Miller. *See* Def. Ex. C at 25-26.

Miller spent the night in jail, but was released on bond the next morning, May 11, 2000. *See* Def. Ex. A at 46-47.  He contends that he was never told by Garrison what he was charged with.[5]  On the same day, Assistant District Attorney John Gruenwald screened Garrison's arrest report and recommended that he issue a warrant. *See* Def. Ex. C at 26-27; Ex. I.  Garrison

---

[4] In his deposition, Garrison stated that the second pill was Cretametaphine, but still stated that it contained codeine.

[5] Miller notes that as a result of the arrest, he had to pay for his bond and his lawyer, and he was written up and docked a day's wages at his job. *See* Pl. Ex. 1 at ¶ 14.

4

obtained the warrants the same day, which were signed by the Calhoun County District Court Magistrate. *See* Def. Ex. C at 27; Ex. E. Garrison had no further involvement in the prosecution. *See* Def. Ex. C at 28. The pills were sent to the Alabama Department of Forensic Analysis, and the tests confirmed that the pills were as previously identified. *See* Def. Ex. F. Howell testified that, after reviewing the case, he concluded that Miller had been properly arrested. *See* Def. Ex. I. Ultimately, Miller's defense attorney produced evidence that Miller had been given a prescription for the pills in July 1996; however, according to Howell, "said prescription had obviously expired by the time Mr. Miller was arrested in May of 2000." *Id.* Indeed, Miller himself stated that he had difficulty in obtaining the records. *See* Def. Ex. A at 55-56. Because Miller, at some point, had been given a prescription for the pills, Howell decided to nol pros the case. *See* Def. Ex. I. However, "[a]t no time" did Howell conclude that Miller "had not in fact been properly arrested and charged." *Id.* On July 7, 2000, the charges against Miller were dismissed. A representative of defendant City of Anniston ("the City"), Lieutenant Toby Falk, testified that the City had no involvement in the prosecution and that the District Attorney's office did not notify them when the case was dismissed. *See* Def. Ex. H at 12.

Miller filed his original complaint on July 5, 2002. By order dated October 30, 2002, the court dismissed the majority of plaintiff's claims and allowed him to file an amended complaint. On December 11, 2002, plaintiff filed his amended complaint. In his brief, Miller has narrowed his claims.[6] Against Garrison individually, he alleges a claim for violation of equal protection under 42 U.S.C. § 1983, a claim for assault and battery, and a claim for abuse of process.

---

[6] *See also* Letter of March 4, 2003.

Against the City, Miller also alleges an equal protection claim, as well as a claim for wrongful destruction of evidence and a claim for conversion. Defendants now seek summary judgment as to all claims.[7]

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for

---

[7] It appears to the court that defendant Wayne Chandler is still a party to this lawsuit. However, as Miller seems to have abandoned any purported claims against him, he will be dismissed from this action.

discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Claims Against Garrison Individually

A. EqualProtection/Section 1983[8]

1. Defendant's Position

First, Garrison argues, any abuse of process claim should be dismissed because it is barred by the statute of limitations. Garrison contends that this claim accrued no later than May 11, 2000, the date that the purportedly wrongful process was issued. *See, e.g., Michaels v. New Jersey*, 955 F. Supp. 315 (D.N.J. 1996). Unlike a claim for malicious prosecution, "in an action for abuse of process it is unnecessary for the plaintiff to prove that the proceeding has terminated in his favor." *Tarver v. Household Fin. Corp.*, 277 So. 2d 330, 333 (Ala. 1973). Garrison also argues that a theory of a "continuing wrong" is inapplicable, because "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts

---

[8]Garrison addresses several potential § 1983 claims, including false arrest, false imprisonment, and excessive force. However, in his response, Miller conceded that, except for an abuse of process and/or malicious prosecution claim, all of his § 1983 are barred by the statute of limitations. In his brief, Garrison treats the malicious prosecution/abuse of process claims as Fourth Amendment claims, while addressing the Equal Protection argument separately. He also assumes that Miller has filed a state <u>and</u> federal claim for abuse of process and malicious prosecution. He has organized his arguments accordingly, and the court will do the same.

7

became most painful." *Lorance v. AT & T Techs.*, 490 U.S. 900, 907 (1989).[9] Here, there is no evidence that Garrison committed any wrong, other than a purported malicious prosecution claim, after May 11, 2002. Thus, any abuse of process claim should be dismissed on statute of limitations grounds.

Garrison also argues that he is entitled to qualified immunity on any abuse of process or malicious prosecution claim. Garrison notes that the first step is to analyze whether a constitutional violation occurred. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Only if a violation is found does a court proceed to examine whether the law was clearly established. *Id.* at 201. Looking first at whether a constitutional violation even occurred, Garrison contends that, under these facts, Miller has no malicious prosecution claim. First, he argues, since Miller was arrested without a warrant, the proper claim, if any, is for false arrest, not malicious prosecution. *See Whiting v. Traylor*, 85 F.3d 581, 585 n.8 (11th Cir. 1996)("In contrast, where an arrest is made before the commencement of a criminal proceeding, the most analogous tort might be that of 'false arrest.'"). In *Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995), cited in *Whiting*, the court stated that

> To maintain a § 1983 claim for malicious prosecution under the Fourth Amendment, the deprivation of liberty--the seizure--must have been effected "pursuant to legal process." "The essence of malicious prosecution is the perversion of proper legal procedures." Ordinarily, this "legal process" will be either in the form of a warrant, in which case the arrest itself may constitute the seizure, or a subsequent arraignment, in which case any post-arraignment deprivations of liberty (such as being bound-over for trial) might satisfy this constitutional requirement. In this case, Singer's arrest cannot serve as the predicate deprivation of liberty because it occurred prior to his arraignment and without a warrant, and therefore was not "pursuant to legal process." Typically, a warrantless deprivation of liberty from the moment of arrest to the time of

---

[9]Parts of the opinion in *Lorance* were superceded by the Civil Rights Act of 1991.

8

>arraignment will find its analog in the tort of false arrest, while the tort of malicious prosecution will implicate post-arraignment deprivations of liberty. Therefore, to successfully pursue a § 1983 claim of malicious prosecution in violation of his Fourth Amendment rights, Singer must show some post-arraignment deprivation of liberty that rises to the level of a constitutional violation.

*Id.* at 116-17 (citations omitted). *See also Frantz v. Village of Bradford*, 245 F.3d 869 (6th Cir. 2001); *Lambert v. Williams*, 223 F.3d 257 (4th Cir. 2000). Here, because there was no warrant, Miller does not have a malicious prosecution claim.

Second, Garrison contends, Miller cannot maintain a malicious prosecution claim because Alabama law provides an adequate post-deprivation remedy. Garrison notes that in *Albright v. Oliver*, 510 U.S. 266 (1994), two justices, in a concurring opinion, stated that "our precedents make clear that a state actor's random and unauthorized deprivation of that interest [i.e., malicious prosecution] cannot be challenged under 42 U.S.C. § 1983 so long as the State provides an adequate postdeprivation remedy." *Id.* at 284. According to Garrison, the Seventh Circuit has recently adopted this view. *See Newsome v. McCabe*, 256 F.3d 747, 749-51 (7th Cir. 2001)(discussing the concurring position and stating that "as the narrowest ground of decision, [it] constitutes the effective holding of the Court"). Garrison also cites *United States Steel, LLC v. Tieco*, 261 F.3d 1275 (11th Cir. 2001), in which the court noted that the concurrence "has suggested that such a claim would lack merit where, as here, state law provides a cause of action for malicious prosecution." *Id.* at 1289.[10] Since there is a state law tort of malicious prosecution, Garrison claims, there can be no claim under § 1983. Garrison also contends that, even if there is a § 1983 claim for malicious prosecution, "the plaintiff would be required, at the

---

[10] The court did state however that it "need not address [that] question today." *Id.* at 1289.

very least, to establish the common-law tort of malicious prosecution, including the absence of probable cause." *Tieco*, 261 F.3d at 1289. Here, Garrison contends, there is no question that he had probable cause to arrest Miller, and thus there can be no claim.

Finally, Garrison argues that there can be no malicious prosecution claim because he did not control the prosecution. Garrison notes that in *Whiting* the court stated that

> Recovery of damages is limited to those injuries proved to be *caused by the defendants*. This lawsuit is against arresting officers. In many cases, arresting officers will not be responsible for the continuation of the prosecution because the prosecutor (or some other factor) will break the causal link between defendants' conduct and plaintiff's injury.

85 F.3d at 586 n.10 (emphasis in original). Garrison also cites *Eubanks v. Gerwen*, 40 F.3d 1157 (11th Cir. 1994), in which the court reasoned that

> The evidence in the record reveals that none of the defendants had anything to do with the decision whether or not to prosecute Eubanks. Thus the defendants herein are not proper targets of such a claim. In the within case, if the entire sequence of events, including those relevant to the arrest, is examined, it becomes clear that none of the defendants were responsible for the decision to prosecute, and that none of them improperly influenced the decision to prosecute. They did fully apprise the State Attorney of all relevant information known to them, including that which weighed for and against Eubanks' guilt. In so doing, the defendants concluded what they started to do in this case, i.e. they performed their duties as police officers, by acting on a seemingly reliable tip from a previously reliable informant in making an investigatory stop of a suspect, by then arresting that suspect upon the discovery of cocaine in the automobile, conducting a subsequent continued investigation, and turning over all relevant information about the matter to the State Attorney. But they did not make the decision as to whether or not to prosecute Eubanks; nor did they act in such a way as improperly to influence the decision by the State Attorney in that regard.

*Id.* at 1160-61 (citations omitted). Here, Garrison contends, he had no connection with the prosecution of Miller after he signed the warrant. Greunwald told Garrison to issue the warrant, and Howell made the decision to prosecute the case. There is no evidence to suggest that Garrison misinformed or hid information from these two prosecutors. Thus, Garrison argues, he

cannot be liable for malicious prosecution.

As to an abuse of process claim, Garrison contends that many of the same arguments would apply. First, since there is no malicious prosecution claim for a warrantless arrest, there should not be a claim for abuse of process. Second, because Alabama law provides a remedy for abuse of process, there is an adequate remedy and no § 1983 abuse of process claim should lie. Third, Garrison contends, he had probable cause to sign the warrants. Fourth, as will be discussed more fully below, Garrison contends that Miller cannot meet his burden of proof for a claim of abuse of process under Alabama law.

Next, Garrison argues, even if there has been a constitutional violation, he is entitled to qualified immunity. Garrison cites extensively from *Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001), in which the court stated that

> A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the "preexisting law dictates, that is, truly compel[s]," the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances.
>
> When looking at the preexisting case law, courts, dealing with qualified immunity defenses, must always keep in mind the great distinction between following a precedent and extending a precedent. Two sets of circumstances may be "nearly" the same, but "nearly" can make a great legal difference at the edge. Because fair and clear notice to government officials is the cornerstone of qualified immunity, courts must diligently analyze the preexisting case law to determine whether it really did provide plain notice to every reasonable government official that the pertinent conduct, in the specific circumstances, would clearly violate preexisting federal law.
>
> . . .
>
> When the facts of previous precedents are necessary to give clear warning that certain conduct in specific circumstances will violate federal law, we must look at the facts in the precedent and at the facts that confronted the government official in the case before the court. The two sets of facts must be materially similar. For qualified immunity purposes, a preexisting precedent is materially

similar to the circumstances facing an official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly-situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. But minor variations in some facts (the precedent lacks an arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different from the preexisting precedents, leaving the law applicable--in the circumstances facing the official--not clearly established when the defendant official acted.

To apply properly this "materially similar" principle, the court, surveying the relevant area of law, must discern the facts that were material to the federal law violation in similar preexisting cases. These facts then must be compared to the facts alleged in the case before the court. If there is an absence of a fact (or the presence of an additional fact) in the case before the court, the court must determine whether that fact might make a difference to any reasonable official who had to determine whether his conduct violated federal law in the circumstances in the immediate case. If the court determines that the variance might make a difference, the precedent--when factual particularity is needed to establish the law--cannot clearly establish the law applicable to the circumstances facing the defendant.

*Id.* at 1030-33 (citations and footnotes omitted). Here, Garrison contends, there is no case remotely similar to the instant case, thus he is entitled to qualified immunity.

Lastly, Garrison addresses any potential claim against him for violation of the Equal Protection Clause. First, Garrison contends, to the extent that Miller is alleging "racial profiling," this court dismissed any such claim in its order of October 20, 2002. Moreover, such a racial profiling or selective prosecution claim would be time-barred, because Garrison had no further involvement in the case after May 11, 2000. Finally, Garrison contends that in order to state a claim, Miller must show discriminatory effect and discriminatory purpose. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996). As to the first element, Garrison notes that Miller has not pointed to a single similarly-situated Caucasian who was treated differently. As to

the second, Garrison notes, there is simply no evidence of racial animus in this case.

2. Plaintiff's Response

Miller contends that there is evidence that Garrison maliciously filed and pursued criminal charges and abused the legal process in maintaining those charges prior to their dismissal on July 7, 2000. He also argues that there is evidence that Garrison pursued the claims based on his race. He notes that, according to his version of the facts, he told Garrison several times that the pill bottle had a full label on it, identifying the doctor's name, type of pills, and prescription number. *See* Pl. Ex. 10 at 37-38, 63-64, 72. Miller even told Garrison to call his doctor to confirm that the pills were lawful. *Id.* at 38-40. Miller's pleas continued even while he was being processed at the jail. *Id.* at 41. However, according to Miller, Garrison never asked him if anyone could verify the prescription, and he never bothered to call Miller's doctor. *See* Pl. Ex. 11 at 22-23. Miller also notes that Toby Falk testified that if Garrison had called Miller's doctor, the charges probably could have been avoided. *See* Pl. Ex. 9 at 13-14. Thus, Miller argues, there is evidence that Garrison violated his rights by not listening to him and following up with a brief investigation.[11]

B. State Law Claim for Assault and Battery

1. Defendant's Position

First, Garrison argues, he is entitled to discretionary function immunity found in Alabama Code § 6-5-338(a). Garrison notes that initially he must make a *prima facie* showing that he is entitled to immunity, and that once he does the burden shifts to Miller to show that he is not. *See Moore v. Adams*, 754 So. 2d 630, 631-34 (Ala. 1999). Garrison argues that the court

---

[11] The court notes that the plaintiff's response does not adequately address the statute of limitations issue.

"must first determine whether [the officer] was engaged in performing a discretionary function." *Ex parte City of Gadsden*, 781 So. 2d 936, 938 (Ala. 2000). Discretionary functions are those as to which "there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Wright v. Wynn*, 682 So. 2d 1, 2 (Ala. 1996). According to Garrison, the Alabama Supreme Court has held that arrests are discretionary acts. *See Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000). Thus, Garrison contends, he is entitled to discretionary function immunity unless Miller can show that "the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise," or that he acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Cranman*, 792 So. 2d at 405. Garrison also notes that in *Ex parte City of Montgomery*, 758 So. 2d 565 (Ala. 1999), the court stated that courts should "look to whether [the officer] had probable cause to arrest" the plaintiff. *Id.* at 570 (defining probable cause). Thus, Garrison asserts, since he had probable cause to arrest Miller, he is entitled to discretionary function immunity.

Garrison also argues that, substantively, he is entitled to summary judgment. Garrison notes that in *Wright v. Wright*, 654 So. 2d 542 (Ala. 1995), the court defined "assault" as "an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt." *Id.* at 544 (citations omitted). The court went on to state that a "successful assault becomes a battery,

14

which consists of the touching of another in a hostile manner." *Id.* Here, Miller stated that Garrison was not rude to him and that he did not struggle when handcuffed. Any de minimus assault or battery is not enough to support a claim, as officers are privileged to use the amount of force necessary to make an arrest. *See City of Birmingham v. Thompson*, 404 So. 2d 589 (Ala. 1981).

### 2. Plaintiff's Response

Miller also cites the definition of assault and battery found in *Wright*. Miller contends that Garrison wrongfully put the handcuffs on him because he should not have been arrested. He also notes that he stated that the handcuffs were put on too tight, that his wrists "were sore for awhile." *See* Pl. Ex. 10 at 40. This unwarranted touching, Miller argues, meets the Alabama court's definition of assault and battery.

### C. Common-law Malicious Prosecution/Abuse of Process

### 1. Defendant's Position

Garrison makes the same discretionary function immunity argument as made before. In addition, Garrison notes that "an abuse of process, [is] distinguished from the action of malicious prosecution; the chief distinction being that the former rests upon the improper use of a regularly issued process, while the latter has reference to the wrong in the issuance thereof." *Clikos v. Long*, 165 So. 394, 395 (Ala. 1936). However, Garrison contends, both actions are disfavored in the law. *See Cutts v. Am. United Life Ins. Co.*, 505 So. 2d 1211, 1212 (Ala. 1987). Such disfavor is based on the fact that "public policy requires that all persons shall resort freely to the courts for redress of wrongs and to enforce their rights, and that this may be done without the peril of a suit for damages in the event of an unfavorable judgment by jury or judge." *Boothby*

15

*Realty Co. v. Haygood*, 114 So. 2d 555, 559 (Ala. 1959).

Garrison also notes that the abuse of process claim is barred by the statute of limitations. Garrison contends that there is no specific applicable statute of limitations, so the two-year "catch-all" found in Alabama Code § 6-2-38(l) would apply. Garrison contends that an abuse of process claim accrues when the process is first issued, in this case May 11, 2000, and thus any claim is time barred.

Substantively, Garrison notes that a malicious prosecution claim requires "(1) a judicial proceeding initiated by the defendant, (2) a lack of probable cause, (3) malice, (4) termination of the judicial proceeding favorably to the plaintiff, and (5) damages." *Escoffier v. Anderson*, 557 So. 2d 844, 845 (Ala. Civ. App. 1990). Garrison contends that there is no evidence of malice or a lack of probable cause. He also notes that "[w]hen probable cause exists, proof of the highest degree of malice gains the plaintiff nothing. . . . Yet, when probable cause is shown to be lacking, malice is essential to recovery." *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 832 (Ala. 1999)(citations omitted). Garrison contends that he had probable cause, and even if he did not, there is no evidence of malice on his part.

As to abuse of process, Garrison notes that Miller must show "1) the existence of an ulterior purpose, 2) a wrongful use of process, and 3) malice." *C.C. & J., Inc. v. Hagood*, 711 So. 2d 947, 950 (Ala. 1998). Garrison contends that none of these elements are present here. He also cites *Shoney's, Inc. v. Barnett*, 773 So. 2d 1015 (Ala. Civ. App. 1999), in which the court stated that

> The first element of the tort of abuse of process is the existence of an ulterior purpose. Abuse of process has been defined as "the malicious perversion of a regularly issued process to accomplish a purpose whereby a result not lawfully or properly obtainable under it is secured." As our supreme court has explained, a

16

defendant cannot be liable for the tort of abuse of process "'[i]f the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint.'" However, liability attaches "'if the suit is brought, not to recover on the cause of action stated in the complaint, but for a collateral purpose.'" For example, if a creditor, who was legally entitled to garnish a debtor's wages, garnished the debtor's exempt wages solely for the purpose of coercing the debtor to pay the entire debt, the creditor would be liable for abuse of process. "Thus, if a defendant prosecutes an innocent plaintiff for a crime without reasonable grounds to believe him guilty, it is malicious prosecution; if he prosecutes him with such grounds to extort payment of a debt, it is abuse of process."

. . .

. . . [T]he plaintiff must also prove that the defendant wrongfully used process to achieve the intended ulterior purpose. "'[T]here is no liability where the defendant has done nothing other than carry out the process to its authorized conclusion, even though with bad intentions. . . . [I]t is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.'" As the supreme court explained, the plaintiff in an abuse of process case must prove that the defendant "somehow acted outside the boundaries of legitimate procedure after the [initiation of the proceeding]." The supreme court discussed the interplay of ulterior motive and wrongful use of process: "'[T]he [ulterior purpose] must culminate in an actual abuse of the process by perverting it to a use to obtain a result which the process was not intended by law to effect. . . .'"

. . .

The final element of the tort of abuse of process is malice. When attempting to determine whether a plaintiff has proven malice in an abuse of process case, the focus is "not [on whether the defendant holds] ill will [against the plaintiff], or [is acting out of] spite, but rather, [whether] the [defendant] employ[ed] the process . . . for an end not germane thereto, for achievement of a benefit totally extraneous to or of a result not within its legitimate scope[.]" Once the plaintiff establishes an ulterior purpose and a wrongful use of process, "malice is made to appear in the eyes of the law."

*Id.* at 1024-26 (citations omitted).

2. Plaintiff's Response

In his brief, Miller does not differentiate between a common-law and a § 1983 abuse of

17

process/malicious prosecution claim. Thus, the court assumes that, if Miller is making a claim under state and federal law, he makes the same arguments concerning both.

**II. Claims Against the City**

    A. Equal Protection/Section 1983

    1. Defendant's Position

In addition to the arguments made by Garrison, the City notes that municipalities cannot be liable under a theory of *respondeat superior*; rather, they can only be liable for "deprivations for which they are actually responsible, acts which the [municipality] has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986). Thus, the City contends, Miller must prove (1) a deprivation of a constitutionally protected interest, and (2) that the deprivation was caused by an official policy of the municipality. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 687, 694 (1978). The City argues that, even assuming that Garrison violated Miller's rights (which it disputes), there is simply no evidence that the City's policies or customs were the driving force behind such a violation. The City notes that a single act cannot be a custom. Rather, there must be a "persistent and widespread" practice. *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001). This high burden is in place, the City contends, because

> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in de facto *respondeat superior* liability on municipalities . . . .

*City of Canton v. Harris*, 489 U.S. 378, 391-92 (1989)(citation omitted). Since Miller can point

to no evidence of a custom, policy, or practice on the part of the City, all claims against it should be dismissed.

### 2. Plaintiff's Response

Miller makes the same arguments that he made in response to Garrison's position.

### B. Wrongful Destruction of Evidence

It does not appear to the court that the City has specifically addressed this claim in its brief. However, Miller argues that there is evidence that the City wrongfully destroyed the pill bottle. Miller again notes that he told Garrison on several occasions that the pill had a label on it and that he could call his doctor to verify the prescription. *See* Pl. Ex. 10 at 37-38, 63-64, 72. Miller also notes that Garrison testified that he made no effort to determine whether Miller's doctor had in fact prescribed the medicine. *See* Pl. Ex. 11 at 55. Toby Falk testified that he thought the pill bottle was Miller's property. *See* Pl. Ex. 9 at 20. Miller argues that the bottle was a key piece of evidence that would have been presented to a jury to determine whether Garrison's and the City's acts were reasonable.

### C. Conversion

The City did not specifically address this claim either. Miller notes that for a claim of conversion, a plaintiff must show "(1) a wrongful taking; (2) an illegal assertion of ownership; (3) an illegal use or misuse of another's property; or (4) a wrongful detention or interference with another's property." *Drennen Land & Timber Co. v. Privett*, 643 So. 2d 1347, 1349 (Ala. 1994). He again notes that the pill bottle was a key piece of evidence and that Toby Falk stated that the pill bottle was Miller's property. Miller also cites Toby Falk's deposition, in which he stated that the City tries to return property to its owners but that he was not aware of whether that

was attempted in this case. *See* Pl. Ex. 9 at 15-16. Miller asserts that the pill bottle should have been returned to him once the charges were dropped.

### CONCLUSIONS OF THE COURT

As to the Equal Protection and Section 1983 claims, the court agrees with reasoning of the defendants. There is no substantial evidence that any of the defendants treated Miller any differently because of his race, nor is there any evidence of malice or other culpable intent on the part of the defendants. In addition, under *Whiting*, there can be no malicious prosecution claim because the arrest occurred before the commencement of criminal proceedings. Further, it is clear to the court that, under these facts, Garrison had probable cause to arrest Miller. Likewise, there can be no abuse of process claim because Garrison had probable cause. In any event, Garrison is entitled to qualified immunity. This same reasoning would apply to any common-law based claim of malicious prosecution or abuse of process.

The court also agrees with Garrison as to the state law claim of assault and battery. Garrison had probable cause to arrest Miller, and any "assault" or "battery" incident to the arrest was de minimus at best. Under these facts, he would also be entitled to discretionary function immunity.

As to the wrongful destruction of evidence and conversion claims against the City, the court elects not to retain supplemental jurisdiction and will dismiss those claims without prejudice.

This _20_ day of May, 2003.

ROBERT B. PRØPST
SENIOR UNITED STATES DISTRICT JUDGE